**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

DARLENE GIBBS, STEPHANIE EDWARDS,
LULA WILLIAMS, PATRICK INSCHO, and
LAWRENCE MWETHUKU, *on behalf of*
*themselves and all individuals similarly situated*

                    Plaintiffs,

v.

TCV V, L.P., and JOHN DOE NOS. 1-15,

                    Defendant.

Civil Action No. 3:19-cv-789

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs, Darlene Gibbs, Stephanie Edwards, Lula Williams, Patrick Inscho, and Lawrence Mwethuku (collectively, the "Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Class Action Complaint against Defendants TCV V, LP., and John Doe Nos. 1-15 (collectively "Defendants"), they allege as follows:

## INTRODUCTION

1. This case involves a rent-a-tribe enterprise that was established to evade state usury laws. As the Court is aware, Plaintiffs filed five cases against other participants in the alleged enterprise. *See Gibbs v. Rees*, Case No. 3:17-cv-00386 (E.D. Va.) (transferred to the bankruptcy court sitting in the Northern District of Texas); *Gibbs v. Plain Green*, *LLC*, Case No. 3:17-cv-00495 (E.D. Va.); *Gibbs v. Haynes Investments*, *LLC*, Case No. 3:18-cv-00048 (E.D. Va.); *Gibbs v. Curry*, Case No. 3:18-cv-00654- (E.D. Va. 2018); *Curry v. Stinson*, 3:18-cv-676 (E.D. Va.). This case is most analogous to *Curry v. Stinson*, which seeks to hold those who started, financed,

and participated in the management of Think Finance, LLC ("Think Finance") responsible for their role in the enterprise.

2. For more than eight years, Think Finance and its subsidiaries (collectively "Think Finance") operated a rent-a-tribe scheme, which sought to evade the usury laws of certain states by using the Chippewa Cree and Otoe-Missouria Tribes (collectively, the "Tribes") as the conduit for their loans. Even though regulatory enforcement efforts and private lawsuits uncovered their misconduct as early as December 2014, Think Finance and others continued to engage in the scheme even though "[n]o one appear[ed] to seriously dispute" that these rent-a-tribe "loans violated a host of state and federal lending laws." *See Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 669 (4th Cir. 2016).

3. Under the rent-a-tribe model, loans were made in the name of Plain Green, LLC and Great Plains Lending, LLC—two entities formed under tribal law to serve as the fronts to disguise Think Finance's role and to ostensibly shield the scheme by exploiting tribal sovereign immunity. In return for the use of their name, the tribal companies received a nominal flat-fee of the revenue from the loans, but they otherwise had no control over the income, expenses, or day-to-day operations of the businesses.

4. Since at least 2011, Defendant TCV, L.P. ("TCV") owned approximately 20% of the interest in Think Finance. Through its ownership of Think Finance, Defendant participated in the business's key decisions, strategies, and objectives and, in return, generated large profits from its ownership interest in Think Finance. In addition, TCV provided a large portion of the investment capital used by Think Finance to carry out the scheme. Defendants John Doe Nos. 1-15 are the directors, officers, and owners of TCV who participated in the operation and

management of Think Finance; and received profits associated with the illegal loans through their ownership of TCV.

5.      This lawsuit seeks to hold Defendants liable for their violations of state usury laws and federal laws in the collection of loans with usurious interest rates. Based on TCV's conduct, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. TCV received millions of dollars derived from the collection of unlawful debt. Further, TCV acquired and maintained interests in the rent-a-tribe enterprise and were aware of its scheme to repeatedly violate state lending statutes resulting in the collection of unlawful debt from Plaintiffs and the class members. TCV's acts described herein are unlawful as set forth in 18 U.S.C. § 1962(a)-(d).

6.      Plaintiffs also assert a class claim for violations of state usury laws and unjust enrichment. Because the loans exceed 12% annual percentage rate ("APR"), such loans are null and void and neither the lender nor any third party may collect, obtain, or receive any principal, interest, or charges on the loans. Va. Code § 6.2-1541. Accordingly, Plaintiffs and the class members seek to disgorge all amounts paid by Virginia consumers in excess of 12%, plus twice the amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorneys' fees and costs. Va. Code § 6.2-305(A).

## JURISDICTION

7.      This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as a majority of Plaintiffs are residents of this District and Division and a substantial part of Plaintiffs' claims occurred in Virginia.

## PARTIES

9.      Plaintiff Lula Williams ("Williams") is a natural person and resident of this Division and District.

10.     Plaintiff Stephanie Edwards ("Edwards") is a natural person and resident of the Commonwealth of Virginia.

11.     Plaintiff Darlene Gibbs ("Gibbs") is a natural person and resident of the Commonwealth of Virginia.

12.     Plaintiff Patrick Inscho ("Inscho") is a natural person and resident of the Commonwealth of Virginia.

13.     Plaintiff Lawrence Mwethuku ("Mwethuku") is a natural person and resident of the Commonwealth of Virginia.

14.     Defendant TCV V, L.P.("TCV") is a Delaware corporation with a principal place of business in California. Upon information and belief, TCV owned approximately 20% of the interest in Think Finance at all times relevant hereto. Through its ownership of Think Finance, TCV operated and participated in the affairs of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise.

15.     Defendant John Doe Nos. 1-15 are unidentified parties who participated in the enterprise with TCV, Think Finance, Great Plains, Plain Green, Victory Park, and the others involved in the illegal enterprise, including officers, directors, and employees of TCV.

## BACKGROUND

**A.**   **Virginia law prohibits usury and provides for strict licensing requirements to protect consumers from predatory and abusive lending practices.**

16.     More than forty years before the signing of the Declaration of Independence, Virginia enacted its first usury law, which capped interest rates at 6 percent. John W. Edmonds III, *Virginia Law of Interest and Usury*, 10 U. Rich. L.R. 77, 77 (1975), *available at* https://scholarship.richmond.edu/cgi/viewcontent.cgi?article=1313&context=lawreview.

17.     Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 601 (1984).

18.     The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *Id.* (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972)).

19.     In accordance with this longstanding public policy, a person may not charge an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A).

20.     If a person violates the interest rate cap, Virginia's Consumer Finance Act imposes severe consequences, including criminal liability and forfeiture of all principal, interest, and any charges related to the loan. Va. Code § 6.2-1540 (making it a class 2 misdemeanor for any person who violates or participates in the violation of Virginia's interest rate cap); Va. Code § 6.2-1541(A) (declaring such loans "void" and principal uncollectible).

21.     Virginia's Consumer Finance Act is a remedial statute that "originated to protect needy consumers from unjust terms and exploitation surrounding lending practices." *Com. v. Car*

*Pawn of Virginia, Inc.*, 1995 WL 17044380, at *4 (Va. Cir. 1995); *see Greenberg v. Com. ex rel. Atty. Gen.*, 499 S.E.2d 266, 269 (Va. 1998). Thus, it was designed to protect Virginia consumers from the very type of predatory lending scheme Defendants participated in, which sought to evade state lending laws, including Virginia's, by entering into ventures with Native American tribes "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders & Tribes: Are Both Tribal Sovereignty & Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 758-59 (2012)).

    **B.**    **The rent-a-tribe model was developed to evade state usury laws, such as Virginia's.**

    22.    Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account."[1] These types of debt traps "are heavily marketed to financially vulnerable consumers."[2]

    23.    Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005, "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* ¶ 21, at 759 (quoting Karen E. Francis, Note, *Rollover,*

---

[1] *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

[2] *See CFPB Finalizes Rule To Stop Payday Debt Traps*, CFPB (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. "A debt trap results when a borrower is repeatedly unable to repay a loan and must reborrow, paying additional fees each time." *See Payday, Vehicle Title, and Certain High-Cost Installment Loans*, *supra* note 1, at 1853.

*Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611-12 (2010)).

24.     It is no secret that "internet payday lenders have a weak history of complying with state laws." *Id*. at 764. Prior to the rent-a-tribe business model, some payday lenders, including Think Finance, entered into partnerships with national banks to avoid compliance with state laws.[3]

25.     Beginning in 2005, federal regulators began cracking down on rent-a-bank arrangements, and they were nearly eliminated by 2010—largely by the assessment of penalties and fines against participating banks. *See, e.g.*, Creola Johnson, *America's First Consumer Financial Watchdog Is on A Leash: Can the CFPB Use Its Authority to Declare Payday-Loan Practices Unfair, Abusive, and Deceptive?*, 61 Cath. U. L. Rev. 381, 399 n.16 (2012).

26.     In response to the crackdown on rent-a-bank arrangement, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. *Id*.; *see also* Martin & Schwartz, *supra* at ¶ 21.

27.     "In these partnerships, online payday lenders register businesses on Native American lands and claim to be exempt from lawsuits and state usury caps under tribal sovereign immunity. Using this doctrine, lenders argue that because their businesses are located on or headquartered within the borders of a Native American reservation, they are bound by the laws of that reservation only, not the laws of the state in which the reservation is located or the state in which the borrower resides." Johnson, *supra* ¶ 21, at 399 (footnotes omitted).

---

[3] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17-22 (2001), available at http://www.consumerfed.org/pdfs/paydayreport.pdf.

28.     A central feature of the rent-a-tribe business model is the choice-of-law provision used in the scheme's lending agreements. The non-tribal participants in the scheme will claim that they have no liability for their violations of state and federal laws because only tribal law applies to the loans. Such claims have been uniformly denied by courts from a variety of jurisdictions across the country, thus demonstrating the illegality of the rent-a-tribe lending scheme.[4]

C.     **Think Finance developed the rent-a-tribe scheme to evade state usury laws, such as Virginia's.**

29.     Prior to the creation of the lending scheme at issue, Think Finance used a rent-a-bank lending model. *See* Ex. 1.

30.     Under this arrangement, loans were originated in the name of First Bank of Delaware, but the bank served as nothing more than a nominal lender on behalf of Think Cash, Inc. ("Think Cash"), Think Finance's predecessor. Ex. 1 at TF-PA-504641.

31.     In return for the use of its name, First Bank of Delaware received 10% of the revenue from the loans. Ex. 1 at TF-PA-504640.

32.     By contrast, through its wholly owned subsidiary TC Administrative, Think Cash received the "excess" of the cash flow after accounting for losses, management fees, and fixed rate interest payments to investors, i.e., the third parties who invested money to allow Think Cash to grow the scheme. Ex. 1 at TF-PA-504640.

---

[4] *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016); *W. Sky Fin., LLC v. State ex rel. Olens*, 300 Ga. 340, 348 (2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, No. 13-60066-CIV, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, No. 13 CVS 16487, 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes*, 811 F.3d at 675; *Rideout v. CashCall, Inc.*, No.  2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

33.     In August 2010, the Federal Deposit Insurance Corporation took steps to shut down Think Finance's arrangement with First Bank of Delaware through a cease and desist order directing it to terminate its relationship with "all third-party lending programs."

34.     In response, the owners and executives of Think Finance developed a solution— they decided to adapt their business model to use a tribal entity as a conduit for the loan. Upon information and belief, TCV (through its officers and directors) played a role in developing, authorizing, and implementing the scheme.

35.     The purpose of adopting the rent-a-tribe model was to avoid banking regulatory issues and leverage Think Finance's existing sourcing, underwriting, and servicing platforms from the discredited rent-a-bank model.

36.     Think Finance identified state regulation, including interest rate caps and prohibitions on payday lending to be their primary regulatory concern.

37.     Think Finance modeled their rent-a-tribe model after CashCall, Inc., which they identified as their main competitor, and Think Finance retained the same legal counsel used by CashCall to construct the tribal lending model, Claudia Callaway.

38.     Instead of using a national bank as a nominal lender, Think Finance would use a business entity organized under the laws of a Native American Tribe as the nominal lender. The entity organized under tribal law would originate installment loans that were substantially similar to the loans originated under the rent-a-bank arrangement.

39.     Within a few days of origination, the loans would be purchased by a limited partnership controlled by Victory Park, GPL Servicing, Ltd. ("GPLS").

**D.      The role of GPLS in the lending scheme.**

40.     As a part of its repositioning from the rent-a-bank model to the rent-a-tribe model, Think Finance created GPLS.

41.     GPLS is an employee-less, Cayman Islands limited partnership, which would purchase a 99% participation interest in the loans within a few days of origination by the entity organized under tribal law.

42.     According to Think Finance itself, GPLS was created "to allow investors to purchase interests in the consumer loans originated by Native American Tribal lending businesses." *See Think Fin., LLC*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. at ¶ 24) (explaining the creation of GPLS).

43.     With the assistance of Victory Park, a Chicago investment firm, "GPLS raised money from investors," and these funds were then used to expand the portfolios of Plain Green, and Great Plains. *See, e.g., Think Fin., LLC*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. at ¶ 25.

44.     As a part of this process, both Plain Green and Great Plains entered into a "Participation Agreement" with GPLS, which established GPLS's right to purchase an "undivided ninety-nine percent (99%)" interests in the loans, "including any income or profits therefrom and the applicable Loan Documents." Ex. 2 at § 2(a).

45.     The participation interests were sold to GPLS at "book value" within two days of the origination of the loan. Ex. 2 at § 2(b).

46.     As a result of the purchase, GPLS was "considered for all purposes as, the legal and equitable owner" of the interest in each loan "and the associated Loan Documents… together with all of the rights, privileges and remedies applicable thereto." Ex. 2 at § 2(c).

47.     In return for the use of its name on the loans, the entity organized under tribal law would receive a nominal fee. For example, Great Plains received a "Service Fee" of 6%. Ex. 2 at § 1(fff); Ex. 2 at § 2(a).

48.     Through a separate agreement entitled "Administrative Agency Agreement," GPLS retained a Think Finance subsidiary, TC Administrative Service, as "the exclusive provider of the administrative services" for the loans. *See generally* Ex. 3.

49.     TC Administrative received an "Agent Fee," which was defined as "the interest and fees received on the Purchased Loans during such months," as well as the "principal collected in such month on Purchased Loans that were Non-Current Purchased Loans in the prior month." Ex. 3 at 2.

50.     TC Administrative's fee was reduced by: (1) a 20% "Fixed Return" of the outstanding principal amount loaned by GPLS, and (2) any and all expensed incurred by GPLS, "including, but not limited to, the Revenue Share paid to [Great Plains] for such months" pursuant to the Participation Agreement. Ex. 3 at 2.

51.     Upon information and belief, TCV (through its officers and directors acting within the scope of their authority on behalf of TCV) had knowledge of and approved of the Participation Agreements.

**E.      Think Finance solicited the Otoe-Missouria to form Great Plains in furtherance of the rent-a-tribe scheme.**

52.     On or around January 12, 2011, representatives of Think Finance met with members of the Otoe-Missouria Tribe. *See generally* Ex. 4.

53.     Prior to this meeting, employees of Think Finance created a PowerPoint presentation entitled "Great Plains Lending Meeting," which contained an agenda of key points to present to the Otoe-Missouria Tribe. Ex. 4 at 1.

54.     The agenda of key points included a company overview of Think Finance, an overview of the loan program, the structure of the arrangement, contractual arrangements, operational responsibilities, and next steps. Ex. 4 at 2, 9-10.

55.     Great Plains had not been formed as of the date of this meeting, and, the presentation identified one of the "next steps" as "[c]reate tribal entity—Great Plains Lending, LLC. Ex. 4 at 13.

56.     The other steps included setting up a "tribal bank account at FBD," "[r]eview/approve consumer legal documents," and "[r]eview/sign contractual agreements." Ex. 4 at 13.

57.     Although Great Plains had not been incorporated as of the meeting, Think Finance had already registered the domain name for the Great Plains website and developed the text and graphics for the website—samples of which were included in the PowerPoints. Ex. 4 at pg. 5.

58.     In February 2011, Think Finance held another meeting with the Otoe-Missouria Tribe to promote the potential venture. *See generally* Ex. 5.

59.     As part of this process, Think Finance created a PowerPoint entitled "Emergency Cash Lending—A New Source of Tribal Revenue." Ex. 5 at 1.

60.     The PowerPoint claimed that "[o]nline emergency cash lending" represented "a significant opportunity for increased tribal revenue" and that Think Finance had "a unique turnkey solution for helping tribes enter this lucrative market." Ex. 5 at 2.

61.      The "[t]urn-key solution include[d] technology, marketing, risk management, compliance support, and access to capital funding," which could be "[u]p and running 90 days from signed contracts." Ex. 5 at 3.

62.     More specifically, Think Finance touted that it had: (1) a "proven technology platform," that had "millions of transactions processed to date," (2) a "marketing machine" that had "100,000 applications monthly," (3) "best in class underwriting," (4) "access to third party

capital," including "up to $150" million for funding the loans, and (5) "extensive compliance experience," including multiple "successful FDIC and state exams." Ex. 5 at 6.

63.    Think Finance further explained that "[u]sing Think Finance technology and services," would allow tribes to "generate millions of dollars in cash flow with no investment in technology, lending capital, or marketing costs, and with no risk of loss." Ex. 5 at 2.

64.    The primary sources of this revenue were "[e]mergency cash users—mainstream Americans," who were "65% female," with household income of "$25K-50K" who primarily needed the emergency loans for unexpected bills, medical costs, car repairs, or to avoid overdrafts. Ex. 5 at 4.

65.    The PowerPoint further claimed that "Recent Rulings Have Confirmed that Tribes Can Provide These Services without State Regulatory Jurisdiction." Ex. 5 at 4.

66.    The PowerPoint included the following flow chart to help summarize the structure:





Ex. 5 at 18.

67.    On February 24, 2011, the Otoe-Missouria accepted Think Finance's proposal.

13

**F.      Think Finance solicited the Chippewa Cree Tribe to form Plain Green in furtherance of the rent-a-tribe scheme.**

68.      On March 11, 2011, Think Finance, the Chippewa Cree Tribe, Victory Park (through its ownership of GPLS), and Haynes Investment entered into the initial term sheet for a separate rent-a-tribe venture.

69.      Consistent with the rent-a-bank arrangement, Think Finance agreed to provide the infrastructure to run the lending operations, including the software, "risk management, application processing, underwriting assistance, payment processing, and ongoing service support" for consumer loans in the name of the Chippewa Cree Tribe. Ex. 6 at 1.

70.      In return, the Chippewa Cree Tribe agreed to commit "its best efforts" to complete certain "critical path items" within 14 days, including forming Plain Green, revising the Tribal Transaction Code to allow for the arrangement's lending products, setting up bank accounts and ACH processing for Plain Green, and obtaining separate originating and servicing addresses for Plain Green. Ex. 6 at 3.

71.      In return for the use of its name, Plain Green received "4.5% of cash revenue received" on the loans, as well as reimbursement for expenses. Ex. 6 at 3.

72.      Consistent with the PowerPoints, the Chippewa Cree Tribe was not required to contribute any of its own money to fund the loans or operations. Ex. 6 at 1.

73.      Because of Think Finance's control and role, the former chief executive officer of Plain Green, Billi Anne Raining Bird, recently testified that she agreed with the plaintiffs' characterization that Plain Green was a "rent-a-tribe." Ex. 7, Raining Bird Depo. 52:13-55:13.

74.      Raining Bird further testified that (1) Plain Green had no meaningful role in the lending program other than pro forma review of recommendations from Think Finance; (2) Think Finance handled every material aspect of the lending program, including marketing, underwriting,

origination, servicing, funding, and collection of the loans; and (3) Think Finance intentionally tried to conceal information from Plain Green so that it was dependent on Think Finance, who could then continue to demand the vast majority of the profits from the lending business. Ex. 7, Raining Bird Depo., 85:8-22; 102:3-18, 139:8-141:15

### H.    TCV's role in the enterprise.

75.    TCV was one of "Think Finance's Key Investors." *See* Ex. 1 at TF-PA-001677.

76.    Since 2011, TCV owned approximately 20% of the shares of Think Finance and, through its ownership of Think Finance, it participated in the key decisions and strategies for developing and implementing the lending scheme. Moreover, TCV had knowledge and approved of the general nature of Think Finance's business, including its solicitation of and decision to enter into the ventures with Great Plains and Plain Green.

77.    Upon information and belief, TCV's officers, directors, and employees attended quarterly board of director meetings with the officers and executives of Think Finance whereby they directed, reviewed, and approved key business decisions of Think Finance, including decisions related to the origination, marketing, underwriting, servicing, and collection of the loans.

78.    In addition, TCV provided capital to Think Finance, who then used it to fund the scheme and make the loans in the name of the tribal enterprises.

79.    TCV was fully aware of the practices of the enterprise and knew that the practices violated the law.

80.    For example, upon information and belief, TCV had knowledge of and participated in Think Finance's decision to challenge a cease and desist issued to Great Plains warning it to stop offering its illegal credit products to New York consumers. *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F.Supp.2d 353, 356 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

81.     Think Finance funded and spearheaded this litigation, including drafting the complaint and deciding when to file but left its name off the pleadings.

82.     On September 30, 2013, the district court denied Great Plains' request for a preliminary injunction, finding that the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands," and thus, Great Plains was "subject to the State's non-discriminatory anti-usury laws." *Id*. at 361.

83.     The district court further reasoned, "There is simply no basis…that the Tribes are treated differently from any other individuals or entities that enter New York to lend to New York residents." *Id*.

84.     On October 1, 2014, the Second Circuit affirmed the decision and made several damaging observations. Among other things, the Second Circuit noted that "a tribe has no legitimate interest in selling an opportunity to evade state law." 769 F.3d 105, 114 (2d Cir. 2014) (citing *Washington v. Confederated Tribes*, 447 U.S. 134 (1980)).

85.     The Second Circuit further explained that "[m]uch of the commercial activity at issue takes place in New York. That is where the borrower is located; the borrower seeks the loan without ever leaving the state, and certainly without traveling to the reservation" and that "collection clearly takes place in New York." *Id*. at 115.

86.     These damaging findings were not the only problem for lending scheme at the end of 2014—the Pennsylvania Attorney General had filed its enforcement action against Think Finance on December 17, 2014. *See Commonwealth of Pennsylvania v. Think Finance, Inc.*, Case No. 14-7139.

87.      Against this backdrop, Think Finance's executives and owners held a series of meetings in an attempt to enhance the model.

88.     For example, in April 2015, Think Finance held a series of meetings that identified potential revisions to their model to strengthen their business model.

89.     At this time, Think Finance identified a number of possible revisions, including: (1) revising the pricing "for marketing services to reflect reasonable cost plus reasonable profit mark up," (2) replacing "cost plus pricing with risk based pricing," which would then be "determined from bids from all three tribes prior to each marketing campaign," (3) revising "pricing for underwriting services to reflect cost plus a reasonable profit mark up," and (4) having "[t]ribal lenders own at least 5%, expense reimbursement eliminated" or, alternatively, "[e]liminate the tribal revenue share and replace it with residual profits from the fund."[5]

90.     At this time, Think Finance also contemplated "[t]otal wind down of portfolio," including stopping all marketing activities and terminating the websites.

91.     By July 2015, after a series of meetings with Think Finance's executives, TCV (along with other owners and members of the conspiracy) determined to continue Think Finance's business model with Plain Green and Great Plains—with minor revisions to the structure that provided the tribal entities with a larger share of the profits.

92.     And after Ken Rees stepped down as Chairman of Think Finance's Board of Directors, he was replaced by John Drew, the general partner of TCV.

**I.      TCV received unlawful interest and principal on the void loans.**

93.     Through their ownership of and control over Think Finance, TCV participated in the collection of usurious loans in Virginia.

---

[5] Think Finance allowed the powerpoint to be publicly quoted in briefing filed by Ms. Edwards in the bankruptcy case. However, the actual document maintains its confidentiality designation, and, thus, Plaintiffs do not attach it to this Complaint.

94.     Under the terms of the standard Loan Agreements, the interest rates charged were significantly greater than 12% APR—often between 118% and 448%, if not higher.

95.     For example, Inscho was charged with an APR of 448%—over 37 times the 12% interest cap in Virginia for companies that are not licensed by the Commission. Va. Code § 6.2-303(A).

96.     Similarly, Gibbs was charged with an APR of 277.92%, and Williams was charged with an APR of 247.88%.

97.     Neither TCV nor any of the other participants in the lending scheme had a consumer finance license permitting them to make loans charging interest in excess of 12% APR nor did they ever attempted to obtain such a license. *See* Va. Code § 6.2-1501.

98.     Accordingly, the loans are null and void, and it was unlawful for Think Finance, TCV, or any of their affiliated entities to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs. Va. Code § 6.2-1541(A).

99.     TCV and its co-conspirators received at least $711.02 from Ms. Gibbs as a result of the illegal loans to her—most of which was credited as payment for interest or other fees.

100.    TCV and its co-conspirators received at least $15,369.15 from Ms. Edwards as a result of the illegal loans to her—most of which was credited as payment for interest or other fees.

101.    TCV and its co-conspirators received at least $1,858.67 from Ms. Williams as a result of the illegal loans to her—most of which was credited as payment for interest or other fees.

102.    TCV and its co-conspirators received at least $6,042.19 from Mr. Mwethuku as a result of the illegal loans to him—most of which was credited as payment for interest or other fees.

103.    TCV and its co-conspirators received at least $16,210.84 from Mr. Inscho as a result of the illegal loans to him—most of which was credited as payment for interest or other fees.

104.     Through their ownership interest and participation in the enterprise, TCV received amounts collected from Plaintiffs and the class members' loans.

105.     Defendants' conduct also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c).

106.     RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

107.     Defendants charged an interest rate far in excess of the enforceable rate established by Virginia law, and thus, Defendants violated RICO's prohibition against the collection of unlawful debt.

108.     As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT ONE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)
## (CLASS CLAIM AGAINST TCV)

109.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

110.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All individuals: (1) located in Virginia; (2) who took out a consumer loan product with Plain Green or Great Plains.

Plaintiffs are members of this class.

111.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class

members are identifiable through the internal business records maintained by Think Finance and GPLS, and the class members may be notified of the pendency of this action by published and/or mailed notice.

112. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an enterprise existed; (2) whether Defendants received income derived from the unlawful collection of debt; (3) whether Defendants used or invested the part of that income to acquire an interest in, to establish, or to operate the enterprise; and (4) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

113. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

114. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

115. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by TCV's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

116. **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the enterprise, including the receipt of any proceeds arising from the unlawful collection of debt; prohibiting TCV from continuing to engage in the enterprise or selling the outstanding balances on the loans to any third parties.

117. All of the loans made to Virginia residents included an interest rate far in excess of twice the enforceable rate in Virginia, and thus, the loans constitute "unlawful debt" under RICO. 18 U.S.C. § 1961(6).

118.    As alleged above, TCV violated § 1962(a) of RICO through the receipt of income derived, directly and indirectly, through collection of unlawful debt; and through the use and reinvestment of parts of such income to acquire interests in and to further establish and assist the operations of the enterprise.

119.    TCV participated in the collection of the unlawful debt as a principal by aiding, abetting, procuring proceeds from the enterprise, and willfully investing money for the purpose of the unlawful scheme.

120.    Plaintiffs and the class members were injured as a result of TCV's violations of 18 U.S.C. § 1962(a) because the loans would not have been made but for their investment and participation in the enterprise.

121.    Accordingly, TCV is jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

### COUNT TWO:
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(b)
### (CLASS CLAIM AGAINST TCV)

122.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

123.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All individuals: (1) located in Virginia; (2) who took out a consumer loan product with Plain Green or Great Plains.

Plaintiffs are members of this class.

124.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class

members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

125. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an enterprise existed; (2) whether Defendants acquired and maintained an interest in the enterprise; and (3) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

126. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

127. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

128. As alleged above, TCV violated § 1962(b) of RICO by acquiring and maintaining interests in and control of the enterprise involved in the unlawful collection of debt.

129.    TCV participated in the collection of the unlawful debt as a principal by aiding, abetting, procuring proceeds from the enterprise, and by willfully acquiring and maintaining interests in and control of the enterprise.

130.    Plaintiffs and the class members were injured as a result of TCV's violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for TCV's investment and participation in the enterprise.

131.    As a result of its violations, TCV is jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

### COUNT THREE:
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
### (CLASS CLAIM AGAINST ALL DEFENDANTS)6

132.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

133.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All individuals: (1) located in Virginia; (2) who took out a consumer loan product with Plain Green or Great Plains.

Plaintiffs are members of this class.

134.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by the profits generated by Defendants, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Think Finance and GPLS, and the class members may be notified of the pendency of this action by published and/or mailed notice.

---

6 Counts III-VI are alleged against TCV, as well as John Doe Nos. 1-15.

135.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**
Common questions of law and fact exist as to all members of the putative class, and there are no
factual or legal issues that differ between the putative class members. These common questions
predominate over the questions affecting only individual class members. The common questions
include: (1) whether an enterprise existed; (2) whether Defendants participated in the affairs of the
enterprise; (3) whether the loans are "unlawful debt" for purposes of RICO; and (4) what is the
proper recovery for Plaintiffs and the class members against Defendants for their role in the
enterprise.

136.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of
each putative class member. Plaintiffs are entitled to relief under the same causes of action as the
other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts
and legal theories as each of the class members.

137.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate
representatives of the putative class because their interests coincide with, and are not antagonistic
to, the interests of the members of the class that they seek to represent. Plaintiffs have retained
counsel competent and experienced in such litigation, and they intend to continue to prosecute the
action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the
members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them
to not vigorously pursue this action.

138.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the
class members predominate over questions affecting only individual members, and a class action
is superior to other available methods for fair and efficient adjudication of the controversy. The
damages sought by each member are such that individual prosecution would prove burdensome

and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

139. **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of any proceeds arising from the unlawful collection of debt and prohibiting Defendants from continuing to engage in any enterprise pled herein or selling the outstanding balances on the loans to any third parties.

140. As alleged above, Defendants, along with other participants in the enterprise, violated § 1962(c) of RICO through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

141. RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

142. All of the loans made to Virginia residents included an interest rate far in excess of twice the enforceable rate in Virginia.

143.    This conduct began sometime as early as 2011, continues to date, and will be repeated again and again in the future to the detriment of Virginia consumers.

144.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by Defendants.

### COUNT FOUR:
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

145.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

146.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All individuals: (1) located in Virginia; (2) who took out a consumer loan product with Plain Green or Great Plains.

Plaintiffs are members of this class.

147.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Think Finance and GPLS, and the class members may be notified of the pendency of this action by published and/or mailed notice.

148.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** As explained above, common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

149.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

150.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

151.   As alleged above, Defendants violated § 1962(d) of RICO by entering into a series of agreements to conspire to violate §§ 1962(a) and (c), as evidenced by their agreement to provide millions of dollars of financing for the loans with the knowledge that the loans would be made in violation of state usury and licensing laws, including Virginia's.

152.   Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

## COUNT FIVE:
## VIOLATION OF VA CODE § 6.2-305
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

153.   Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

154.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

All individuals: (1) located in Virginia; (2) who took out a consumer loan product with Plain Green or Great Plains.

155.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

156.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to consumers charged interest in excess of that permitted by state usury laws; (2) whether Plaintiffs may recover from Defendants the amounts paid on the loans; and (3) what is the proper recovery for Plaintiffs and the class members against each Defendant.

157.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

158.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

159.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

160.     All of the Plain Green and Great Plains' loans contained interest rates exceeding Virginia's 12% interest rate cap.

161.     As explained above, Defendants each received revenues collected on the loans.

162.     Plaintiffs each paid interest in excess of that permitted by Virginia law.

163.     Accordingly, Plaintiffs and the class members are entitled to recover all amounts repaid on the void loans, and, in certain states like Virginia, Plaintiffs and class members are entitled to twice the amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorney's fees and costs. Va. Code § 6.2-305.

**COUNT SIX:**
**UNJUST ENRICHMENT**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

164.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

165.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Unjust Enrichment Class"—initially defined as follows:

> All individuals: (1) located in Virginia; (2) who took out a consumer loan product with Plain Green or Great Plains; and (3) paid any amount of principal, interest, fees, or other charges.

Plaintiffs are members of the unjust enrichment class.

166.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from Virginia consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

167.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on Defendants; (2) whether Defendants knew or should have known of the benefit; (3) whether Defendants retained an unjust benefit by accepting the proceeds from the void loans; and (4) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

168.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of

action as the other members of the putative class. All claims are based on the same facts and legal theories.

169. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

170. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

171. All of the Plain Green and Great Plains loans to consumers in Virginia were void and unenforceable.

172.     Plaintiffs conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

173.     Accordingly, on behalf of themselves and all other similarly situated, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with Plain Green and Great Plains.

**WHEREFORE,** Plaintiffs request that the Court enter judgment on behalf of themselves and the class they seek to represent against Defendants for:

A.     Certification for this matter to proceed as a class action;

B.     Declaratory, injunctive, and damages relief as pled herein;

C.     Attorney's fees, litigation expenses, and costs of suit; and

D.     Such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**PLAINTIFFS**

By: _____*/s/ Andrew J. Guzzo*_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com

Leonard A. Bennett, Esq., VSB #37523
Craig C. Marchiando, Esq., VSB #89736
Elizabeth W. Hanes, Esq., VSB #75574
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A

Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com
Email: craig@clalegal.com
Email: elizabeth@clalegal.com

*Counsel for Plaintiffs*