**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

DARLENE GIBBS, *et al., on behalf of*
*themselves and all others similarly situated,*

        Plaintiffs,

    v.                                Civil Action No. 3:19-cv-00789-MHL

TCV V, L.P., *et al,*

        Defendants.

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

This class settlement is the result of two years of litigation in multiple jurisdictions, including appeals to both the Fourth and Ninth Circuits. As a result of these efforts, Plaintiffs have obtained a landmark settlement that it is the largest of its kind in the tribal-lending industry, *i.e.*, not a single comparable case has involved a single defendant—let alone two of them—paying $25 million dollars into a common fund. This settlement is remarkable, especially considering: (1) Sequoia Capital and TCV V, L.P. became shareholders in Think Finance long before it shifted to the tribal lending model; and (2) each received $10 million dollars less in dividends (between 2011 and 2019) than the $25 million that they agreed to pay in the Settlement. And this case was inherently complex, requiring the litigation of unique and potentially dispositive defenses, including shareholder liability, standing, compelled arbitration, and contested class certification. The hard-fought litigation reflects the high stakes for the consumer-borrowers, the defendants, and the entire tribal-lending industry.

Unlike the prior settlement—which involved more than a dozen defendants contributing to the settlement fund—this subsequent settlement involves only *three* of the defendants involved in the ongoing litigation: Sequoia Capital (as well as its affiliates and subsidiaries), TCV V, L.P. (as well as its affiliates and subsidiaries), and National Credit Adjusters. In essence, Plaintiffs alleged that diversified investment funds Sequoia Capital and TCV—by virtue of their ownership of roughly 20% of the shares of Think Finance—were responsible for aiding, abetting, authorizing, and facilitating Think Finance's misconduct. As to National Credit Adjusters, Plaintiffs alleged that it was violating state and federal laws because of its ongoing attempt to collect Think Finance's lending products originated in the name of Plain Green, Great Plains, and MobiLoans. The Settlement creates a $50,050,000 settlement fund to provide automatic payments to class members and provides almost $383 million of debt cancellation. Defendant NCA has also agreed to

1

implementation of a process where consumers can obtain full refunds for any money that they paid to NCA over their state's interest-rate cap, ensuring an even greater cash recovery.

After a hearing on December 8, 2020, the Court preliminarily approved the Settlement. (ECF No. 43.) The Settlement Administrator sent the court-approved notice to the 1,031,852 Class Members by e-mail or first-class mail. *See* Ex. 1, Declaration of RSM at ¶¶ 4-10. Class notice was delivered to 99.5% of Class Members, none of whom substantively objected,[1] and the Settlement Administrator has only received valid ten exclusion requests[2]. Ex. 1, RSM Decl. at ¶ 16. Therefore, pursuant to Fed. R. Civ. P. 23, the Parties request that the Court confirm its certification of the proposed Class, approve the proposed Class Settlement, award attorneys' fees, costs, and the Class Representative Service Awards, and dismiss the claims with prejudice.

## BACKGROUND OF THE LITIGATION AND CLAIMS TO BE SETTLED

As this Court is aware, Plaintiffs filed various cases related to Think Finance's illegal lending scheme designed to ostensibly evade state usury laws by originating high interest loans in the name of entities formed by Native American tribes. *See, e.g.*, *Gibbs v. Rees*, Case No. 3:17-cv-00386 (E.D. Va. 2017) (*Gibbs I*); *Gibbs v. Plain Green*, *LLC*, Case No. 3:17-cv-00495 (E.D. Va. 2017) ("*Gibbs II*"); *Gibbs v. Curry*, Case No. 3:18-cv-00654 (E.D. Va. 2018). Those cases

---

[1] Four consumers, all represented by Berman Tobacco and Gravel & Shea, filed "objections" to the Settlement. Plaintiffs will address these "objections" in separating filings, but for the purposes of this Motion, the Court can note that none of the "objections" identified any issues with the Settlement's material terms, and in fact expressly stated as much. Instead, the "objections" only argued that Berman Tobacco and Gravel & Shea should be paid in attorneys' fees from the Settlement.

[2] As referenced in the RSM Declaration, there were two additional exclusions requests from individuals who did not appear to be Class Members. These exclusion requests were also defective because neither individual checked the box to exclude themselves from the settlement. RSM and Class Counsel tried to reach contact both individuals about their request, but were unable to reach them.

focused on the role and liability of Think Finance and its chief executive officer, certain investors such as Victory Park, and business partners in the alleged enterprise.

In *Gibbs I*, Plaintiffs alleged that Think Finance's lending operation constituted a "rent-a-tribe," where it originated high-interest loans through entities formed under tribal law in an attempt to evade state and federal laws. As *Gibbs II*, Plaintiffs filed a pair of cases against two of Think Finance's tribal-lending partners, Great Plains and Plain Green. *Gibbs v. Plain Green, LLC*, Case No. 3:17-cv-495 (E.D. Va.); *see also Brice v. Plain Green*, Case No. 3:18-cv-1200 (N.D. Cal). Through both of these cases, Plaintiffs obtained significant discovery (including a voluminous document production made by Think Finance), which led to several additional cases against other co-conspirators in the lending enterprise. *See Gibbs v. Haynes Investments, LLC*, Case No. 3:18-cv-00048 (E.D. Va.) (filed on Jan. 22, 2018) ("*Gibbs III*"); *Brice v. Plain Green*, Case No. 3:18-cv-01200-WHO (N.D. Cal) (filed on February 23, 2018); *Gibbs v. Curry*, 3:18-cv-654 (E.D. Va.) (filed on Sept. 25, 2018) ("*Gibbs IV*"); *Burney v. Curry*, Case No. 8:18-cv-03083-WFJ-JSS (M.D. Fla.) (filed on December 21, 2018). Through discovery in these cases—*Gibbs I* through *Gibbs IV*—Plaintiffs identified claims that they could then effectively prove against Think Finance's shareholders, including the Sequoia and TCV Defendants, and they filed the first component of this case on October 4, 2018. *Gibbs v. Stinson*, Case No. 3:18-cv-00676-MHL (E.D. Va.).

Each of these cases stem from Think Finance's illegal lending practices and have included the similar claims under the Racketeer Influenced and Corrupt Organizations Act and various state law claims for usury and unjust enrichment. In the litigation in this case and in *Brice v. Stinson*, 3:19-cv-1481-LB (N.D. Cal.), the Parties have engaged in substantial discovery and motions practice, including exchange and review of discovery responses tens of thousands of additional documents and have effectively found, focused, and curated documents from the previous *Gibbs*

cases to use here. Plaintiffs also accomplished third-party discovery, resulting in the full development of the facts and defenses in the case. Given the lengthy history of these cases, as well as the broader litigation as a whole, no stone has been left unturned. The Parties had the evidence to both prove and value the case.

Although Plaintiffs settled with Think Finance, Plain Green, Great Plains, MobiLoans, Mark Curry, Victory Park, and several others, they refused to broadly release their claims against Think Finance's shareholders and lending enterprise members that were not Think Finance employees or board members, including Sequoia, TCV, and third-party debt buyers. Still, that prior settlement resulted in Think Finance and others: (1) repaying over $53 million dollars in cash and (2) forgiving more than $380 million dollars of debt owed by consumers who took out loans with Plain Green, Great Plains, and MobiLoans. *See generally Gibbs v. Plain Green*, *LLC*, Case No. 3:17-cv-495 (E.D. Va.), Dec. 13, 2019 Order at Dkt. 141 (granting final approval of the class settlement).

The current Defendants have vigorously denied Plaintiffs' allegations and raised a number of defenses, including that state and federal law did not apply to the loans, that Plaintiffs had failed to state a claim for multiple reasons, and that the Court lacked personal jurisdiction over them. As part of these efforts, the parties have litigated extensively before this Court, the Northern District of California, the Fourth Circuit, and the Ninth Circuit. *See, e.g., Gibbs v. Sequoia Capital Operations, LLC*, 966 F.3d 286, 288 (4th Cir. 2020) (finding a tribal arbitration agreement and its choice-of-law provision unenforceable); *Gibbs v. Stinson*, 421 F. Supp. 3d 267, 277–78 (E.D. Va. 2019), *aff'd*, 966 F.3d 286 (4th Cir. 2020); *see also Brice v. 7HBF No. 2, Ltd.*, 2019 WL 5684529, at *1 (N.D. Cal. Nov. 1, 2019) (denying motion to compel arbitration and transfer).

Unlike the other cases against the day-to-day operators of the enterprise, this case presented unique challenges as to whether Defendants could be held liable in their capacity as shareholders of Think Finance. These challenges were exasperated by the fact that one court—in litigation brought by other law firms—held that the borrowers "fail[ed] to state a viable RICO claim against" Sequoia and TCV. *Gingras v. Rosette*, No. 5:15-cv-101, 2016 WL 2932163, at *31 (D. Vt. May 18, 2016). In particular, the court held:

> Allegations that TCV and Sequoia provided financing to the RICO enterprise are not sufficient to show that they conducted or participated in the enterprise's affairs. Allegations that TCV and Sequoia are "investors" (shareholders) in Think Finance, or obtained returns on those investments, are similarly insufficient. Neither would TCV and Sequoia be RICO "participants" just because they were "fully aware" of Plain Green's practices. . . . Here, the FAC does allege a fraudulent financing operation (Plain Green), but that operation extends financing to consumers like Plaintiffs. TCV and Sequoia are not themselves alleged to be the RICO "enterprise"; nor are they alleged to directly make loans to consumers.

*Id*. at *31–32 (internal citations and footnotes omitted). With that decision, Plaintiffs' initial challenge was to survive a motion to dismiss as Defendants presumably expected to achieve the same result here. Plaintiffs not only survived the motion to dismiss, but this Court soundly rejected Defendants' theories and created the framework for potential liability. *Gibbs v. Stinson*, 3:18-cv-676, ECF No. 114 (E.D. Va. Sept. 30, 2019). Even then, extensive discovery in *Brice,* and multiple appeals were all necessary in order to bring Defendants to the settlement table. Despite their successes, settlement of these claims at this posture was also important to the Plaintiffs and the class because, notwithstanding Class Counsel's drive, aggression and confidence, there are substantial litigation risks. Critically, the passage of time has a uniquely harmful effect on class member recovery where, as here, the class includes a large number of consumers in economic distress who need cash now more than ever and who may frequently move, making class notice and payment more difficult.   Plaintiffs also have to acknowledge that Defense Counsel are

experienced, accomplished, and nationally-prominent litigators. All of these factors were important considerations and have led to the settlement now before the Court.

After considering the risks and negotiating for over six months, the Parties arrived at the proposed Settlement. Defendants deny liability and would deny that the case could be properly certified at a contested posture, but do not oppose certification of the Settlement Class for settlement purposes. The Court has already found that the Settlement Class meets the requirements of Rules 23(a) and (b)(3). ECF No. 43 ¶ 4.

## CLASS ACTION SETTLEMENT

**A.      The Settlement terms provide significant and meaningful relief to consumers.**

The Parties agreed to resolve the claims of the following Class (the "Settlement Class"):

> All persons within the United States to whom Great Plains has lent money; all persons within the United States to whom Plain Green lent money prior to June 1, 2016; and all persons within the United States to whom MobiLoans lent money prior to May 6, 2017.

The Settlement Class contains 1,031,852 individual consumers.[3]

The Settlement provides significant relief to consumers nationwide. Class Members will receive cash payments and those that paid it more than their state's usury rate will be able to submit a claim for a refund to NCA.  The legal work required by the individual claim process will be compensated out of this Settlement, and consumers will not have to pay any additional fees for the legal assistance they receive to recover these amounts.

First, Defendants will pay $50,050,000.00 to Class Members, which will be distributed using the same tiered formula of the prior settlements that were previously approved by this Court and the Northern District of Texas, as follows:

---

[3] Here, as in each of the *Gibbs* settlements, Class Counsel has insisted in all cases on the same basic class definition to ensure the alignment of the Class and its interests with the Think Finance Litigation Trust beneficiaries – the exact same class of consumers.

- <u>Tier 1</u>: For all amounts paid if at least the principal balance was repaid and the consumer lived in one of the following states: Arizona, Arkansas, Colorado, Connecticut, Idaho, Illinois, Indiana, Kansas, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Pennsylvania, Ohio, South Dakota, Vermont, Virginia, and Wisconsin; and

- <u>Tier 2</u>: For all amounts of interest paid above the consumer's state's legal limits under the terms of the loan if the consumer lived, at the time the consumer took out the loan in one of the following states: Alabama, Alaska, California, Delaware, Florida, Georgia, Hawaii, Iowa, Louisiana, Maine, Maryland, Michigan, Mississippi, Missouri, Nebraska, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Washington, West Virginia, Washington D.C., and Wyoming; and

- <u>Tier 3</u>: No payment if the consumer lived in Utah or Nevada when the loan was taken out.

ECF No. 29-1, Settlement Agreement § 3.4(b)(iv).

Defendant National Credit Adjusters, a buyer of certain defaulted Think Finance loans, has also agreed to cancel (as disputed debt) all outstanding Great Plains, Plain Green, and MobiLoan debt. It stopped collecting these debts as part of the Settlement on September 17, 2020. Ex. 1 at § 3.4(a)(i)-(iii).[4] According to NCA's records, this results in the cancellation of approximately $383,000,000. Similar to the *Clark v. Trans Union,* Case No. 3:15-391 (E.D. Va.) settlement approved by this Court, the Settlement also creates a process in which consumers who paid National Credit Adjusters after April 16, 2019 can receive additional refunds based on their respective state usury statutes. Class Counsel will help recover these payments for this subclass of class members.  ("Payment Class Members").   These benefits are not included in the Settlement's valuation, but constitute real consideration for Settlement Class Members, who can get an uncapped refund based on the amount of usurious interest paid.

---

[4] Because Think Finance and/or the tribal lenders had previously sold some of the debt originated during the class period, all of the debt originated by Plain Green, Great Plains, and MobiLoans during the class period was not forgiven as part of the prior settlement.

This relief is significant and represents Class Counsel's commitment to the class and their diligent efforts to address the needs of all Class Members as it relates to the Think Finance enterprise.[5] The total paper value of this relief exceeds $433 million dollars[6], which nearly doubles the already groundbreaking Think Finance settlement that the Court previously approved. Altogether, the Plaintiffs have achieved a total cash plus debt relief amount over $866,000,000.00. Class Members will receive the NCA debt cancellation and pro-rata payment of the $50,050,000 automatically and do not need to submit any claim forms or documents to receive compensation.

**B.      Direct notice was sent to the Class.**

In its Preliminary Approval decision, the Court approved the Notice and the Notice Plan (Prelim. Approval Order ¶ 8), which was reviewed and approved by Dr. Shannon Wheatman. (ECF No. 25-6) The Court ordered that the Class Administrator, RSM US LLP, send notice to Class Members. Prelim. Approval Order ¶¶ 8-10. Consistent with the Court's Order, RSM compiled the class list using the data that it had from *Gibbs II*. Ex. 1, RSM Decl. at ¶ 3. Through use of social security numbers, the Class Administrator reviewed the consolidated loan data for each borrower, instead of each loan, and identified 1,031,852 unique Class Members, some of whom had multiple loans. *Id*.

On December 18, 2020, RSM emailed the class notice to 789,863 Class Members. *Id*. at ¶ 4. 36,645 of these were returned as undeliverable. *Id*. at ¶ 5. On July 18, 2020, RSM mailed notices

---

[5] Ex. 2, Kelly Decl. ¶¶ 13-15; *Joyner v. Rocky Mountain Capital Mgmt., LLC*, 3:20-cv-167 (E.D. Va.); *Thompson v. Global Trust Mgmt., LLC*, 3:20-cv-844 (E.D. Va.).

[6] The Court is familiar with Class Counsel's commitment to seek attorney's fees only on measurable value—here, the Settlement Fund.  That is not the case for all class-action lawyers. But it would be disingenuous to value $100 of debt cancellation the same as a $100 cash payment.

to the 241,989 Class Members without email addresses and to the 36,645 Class Members whose emailed notices were undeliverable. *Id*. at ¶¶ 6-7.

As of February 23, 2021, the U.S. Postal Service had returned 744 notices to RSM with a forwarding address. RSM promptly remailed them to the updated address. *Id.* at ¶ 10. RSM also received 23,742 returned notices as undeliverable without a forwarding address. *Id*. at ¶ 8. RSM used a third-party service to obtain updated addresses for 22,916 of those Class Members and remailed the notices to the new addresses. After this updating process, RSM was unable to locate addresses (or received the returned mail after February 15, 2021) for 826 class members. *Id*. at ¶ 9. 3,825 of the re-mailed notices were also returned as undeliverable. *Id*. After RSM's notification process, only 4,651 notices remain undelivered. *Id*. at ¶ 11. Thus, RSM presumably delivered notice to 99.5% of Class Members.

RSM also updated the website from the prior Think Finance settlements (www.thinkfinancesettlement.com) with information about the settlement in this case. Through this website update, class members could view the relevant case documents and sign into a portal to check their eligibility to receive a cash payment. *Id*. at ¶¶ 12-13. Since the update on December 18, 2020, 334,483 unique individuals have visited the website, and 56,245 class members have logged into the portal to view their payment eligibility. *Id*. at ¶¶ 12-14.

RSM also updated the toll-free line originally established in *Gibbs II* with information regarding this settlement. Since that update, RSM has received 5,708 calls from class members. *Id*. at ¶ 15. The Class Administrator also received and handled 3,374 email inquiries since December 9, 2020. *Id.* ¶ 13. Separately, Class Counsel's contact information was included in the class notice. *See, e.g.*, ECF No. 39-1. Class Counsel received and also responded to thousands of emails and calls directly received from consumers. Ex. 2, Kelly Decl. at ¶ 37; Ex. 4, Haac Decl. at

¶ 18. In addition to answering routine questions about the settlement, Class Counsel also addressed and resolved substantive issues for Class Members. For example, numerous Class Members had been contacted by debt collectors, and in many cases, had made separate payments to these entities. Class Counsel advised these consumers on their rights, and ensured that any payments made outside the Defendants' systems were credited to each individual Class Member. Class Counsel also negotiated with the debt collectors for refunds or cancellation, negotiated with other usurious lenders on behalf of Class Members, corrected inaccurate credit reporting, or filed lawsuits on the consumers behalf[7]. In other instances, Class Members did not know how to stop automatic withdrawals from their checking accounts. Class Counsel provided advice and necessary forms to ensure that no unnecessary payments were made. Class Counsel took time to answer questions and to substantively address Class Member issues, ensuring their rights were protected.  Ex. 2, Kelly Decl. at ¶¶ 37-38.  Here, and in many cases, Class Counsel has sought and received a large attorney's fee.  They believe that this fee is earned not only for work as of the settlement's approval date, but also compensates them the significant work after final approval, which often takes years to finish.

C.      **Class Members support the Settlement, and there are no governmental objectors.**

As discussed below, there are no substantive objections to the Settlement,[8] and only ten consumers have opted-out. Ex. 1, RSM Decl. at ¶¶ 16-17.  RSM also served the required Class Action Fairness Act notices on the state and federal attorneys general on November 16, 2020. ECF No. 61, Fiereck Decl. at ¶ 7. None objected to the Settlement. In fact, Class Counsel has maintained contact with the Pennsylvania Attorney General and the Consumer Financial Protection Bureau,

---

[7] *Thompson v. Global Trust Mgmt., LLC*, 3:20-cv-844 (E.D. Va.). More are forthcoming.

[8] The Berman Tobacco and Gravel & Shea fee request is not an "Objection."

both of whom were made aware of negotiations and the settlement. Ex. 2, Kelly Decl. ¶¶ 15-16. Class Counsel had committed to litigating the covered by the Settlement as part of their agreement with each agency in the Think Finance bankruptcy settlement.  And the Settlement has been endorsed by the Retired Bankruptcy Judge Russell F. Nelms, as Litigation Trustee for the Think Finance Litigation Trust, and the Office of Pennsylvania Attorney General as "extraordinary" and "an outstanding result."  Ex. 5, Nelms Decl. ¶ 9, Ex. 6, Ackelsberg Decl. ¶ 19.

**D.     The Settlement Class will release all claims against the Released Parties.**

In return for the substantial Settlement consideration, Class Members will release all claims against the Sequoia and TCV Defendants. ECF No. 29-1, Settlement Agreement § 4.1. Regarding National Credit Adjusters, the release depends on whether a consumer made a payment after April 16, 2019. If a class member did not make a payment prior to that date, the Settlement Agreement provides a broad release to National Credit Adjusters in exchange for cancellation of the debt. ECF No. 29-1, Settlement Agreement at § 4.1(c). However, if a consumer made a payment after April 16, 2019, they can obtain a refund of the amount paid in excess of the applicable state's interest cap. These class members only release their claims for statutory damages and to bring a class action, collective action, or mass action against National Credit Adjusters until they receive their refund. A refund results in a full release as to National Credit Adjustors.

**ARGUMENT**

**A.     The Settlement is fair, reasonable, and adequate and should be approved.**

**1.   <u>The Standard for Judicial Approval of Class Action Settlements.</u>**

 "Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strains such litigation imposes upon already scarce judicial resources." *S.C. Nat. Bank v. Stone*, 749 F. Supp. 1419, 1423 (D.S.C. 1990) (quoting *Armstrong v. Board of School Directors*, 616 F.2d 305, 313 (7th Cir. 1980)).  Rule 23 of the Federal

11

Rules of Civil Procedure requires a court to approve a class-action settlement. *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 571, 2016 WL 6909683 (E.D. Va. 2016). Where, as here, "a district court preliminarily approves a settlement after a hearing, the proposed settlement enjoys a presumption of fairness." *Id.* "First, the Court considers the fairness of the settlement, and then turns to its adequacy." *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 839 (E.D. Va. 2016). Ultimately, the Court has discretion over approval of the proposed settlement. *Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501 (E.D. Va. 1995) (citing *Jiffy Lube*, 927 F.2d at 158).

## 2. <u>The Notice to Class Members Was Reasonable and Satisfied Due Process.</u>

Rule 23(c)(2) requires that notice to the class be "the best practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c). The Rule also requires that the notice inform potential class members that: (1) they have an opportunity to opt out; (2) the judgment will bind all class members who do not opt out; (3) and any member who does not opt out may appear through counsel. *Id.* In assessing the sufficiency of the notice, the Court must consider both the method of delivery and the notice's content. *See* Federal Judicial Center, *Manual for Complex Litigation* § 21.312 (4th 2004). Additionally, Dr. Shannon Wheatman, who helped craft the Federal Judicial Standards notice guidelines for class action settlements, reviewed and approved the form of the notice to be sent to Class Members. (ECF No. 25-6.)

In this case, Class Members were easily identified from the loan applications, which contained the class members' names, addresses, and e-mail addresses. RSM already had the loan information from a prior settlement and updated the address information to make sure the class notice reached as many class members as possible. Ex. 1, RSM Decl. at ¶¶ 3, 8-10. As this Court

has held, "[w]hat amounts to reasonable efforts under the circumstances is for the Court to determine after examining the available information and possible identification methods . . . 'In every case, reasonableness is a function of [the] anticipated results, costs, and amount involved.'" *Fisher v. Va. Elec. & Power Co.*, 217 F.R.D. 201, 227 (E.D. Va. 2003) (citations omitted). Courts—including this Court and others within the Fourth Circuit—have approved notice programs with a much smaller delivery rate. *See In re Serzone*, 231 F.R.D. 221, 236 (S.D. W. Va. 2005) (approving notice program where direct mail portion was estimated to have reached 80% of class members); *Martin v. United Auto Credit Corp.*, No. 3:05cv00143 (E.D. Va. Aug. 29, 2006) (granting final approval where class notice had approximately 85% delivery).

Notice here is also more effective because of Class Counsel's continued supervision of the previous *Gibbs* settlements.  The same website has been used and updated, and class members' addresses have already been updated as a result of the earlier administration efforts. Class notice reached 99.5% of class members. This was the best available notice given: (a) the available information; (b) the possible identification methods; (c) the number of Class Members; and (d) the amount of the Settlement. The Parties have fully complied with the Court's Preliminary Approval Order's notice requirements and have achieved a highly successful notice program.

### 3. **The Settlement Agreement is fair and reasonable under Rule 23(e)** *Jiffy Lube*.

Rule 23(e) of the Federal Rules of Civil Procedure obliges parties to seek approval from the district court before settling a class-action lawsuit. If the settlement proposal would bind all class members, a court may only approve the settlement proposal after it holds a hearing and subsequently finds that the settlement proposal is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e) (2).

In determining whether a settlement is fair, reasonable, and adequate, the court must consider whether:

(A) the class representatives and class counsel have adequately represented the class;
(B) the proposal was negotiated at arm's length;
(C) the relief provided for the class is adequate, taking into account:
     (i) the costs, risks, and delay of trial and appeal;
     (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
     (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
     (iv) any agreement required to be identified under Rule 23(e) (3); and
(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Nevertheless, "[t]he primary concern addressed by Rule 23(e) is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations." *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991).

In the Fourth Circuit, the Rule 23(e)(2) analysis has been condensed into the two-step Jiffy Lube test which examines the fairness and adequacy of the settlement. *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 254 (E.D. Va. 2009); *see also In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158-59 (4th Cir. 1991).

*i. The Parties were fully informed prior to Settlement by the extensive discovery and case's posture*. "Considering the posture of the case at the time of settlement allows the Court to determine whether the case has progressed far enough to dispel any wariness of 'possible collusion among the settling parties.'" *Brown*, 318 F.R.D. at 571. The second *Jiffy Lube* factor—the extent of discovery—ensures that all parties 'appreciate the full landscape of their case when agreeing to enter into the Settlement.'" *Id.* at 572. Here, there are no concerns about possible collusion. In this case and the other related litigations, the Plaintiffs conducted significant discovery into the Defendants' role in the lending enterprise, completed extensive briefing, and thoroughly investigated the facts and claims. In this case (and the companion *Brice case),* Defendants produced tens of thousands of pages of new documents, had multiple meet and confers with Class Counsel, and the parties took third-party discovery. Class Counsel re-reviewed and curated the

14

extensive document production obtained in prior litigation.  And despite these discovery efforts, the settlement was reached only after significant motions practice, including appeals to both the Fourth and Ninth Circuits. *See, e.g., Gibbs*, 966 F.3d at 288.

      *ii. The Parties engaged in extensive mediation efforts*. "The third *Jiffy Lube* fairness factor seeks to 'ensure that counsel entered into settlement negotiations on behalf of their clients after becoming fully informed of all pertinent factual and legal issues in the case.'" *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d at 840 (quoting *In re Mills Corp Sec. Litig.*, 265 F.R.D. 246, 255 (E.D. Va. 2009)). "Courts look to the number of meetings between the parties to discuss settlement, the quality of those negotiations, and the duration of time over which negotiations took place." *Id.* (citing *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 665 (E.D. Va. 2001)).

      In this case, the settlement negotiations involved many dozens of exchanges and countless phone calls over nearly a year. Although the parties had scheduled a mediation, no formal mediation ultimately occurred due to complications with COVID-19. Rather than sit on their hands for a year, Class Counsel worked diligently and strategically on a dual track of discovery and settlement to resolve this case. Ultimately, when compared with the prior Think Finance settlements (which involved several in-person mediations), the similar value of this settlements demonstrates that the negotiations here were arms' length.[9] Class Counsel has obtained substantial relief for Class Members, and when compared against the potential litigation risks, the proposed settlement is fair and appropriate for approval. *See S.C. Nat'l Bank v. Stone*, 139 F.R.D. 335, 339

---

[9] This is equally true when considering the value of other national settlements. *See generally Turner v. ZestFinance, Inc.*, Case No. 3:19-cv-00293 (E.D. Va.), Feb. 25, 2020 Preliminary Approval Order at Dkt. 94 (preliminarily approving settlement providing $18.5 million in cash and $170 million in debt relief to borrowers); *Galloway v. Williams*, No. 3:19-cv-470 (E.D. Va.), Dec. 20, 2019 Preliminary Approval Order at Dkt. 65 (preliminarily approving settlement providing $8.7 million in cash and over $100 million dollars in debt relief for over 300,000 consumers).

(D.S.C. 1991) (concluding fairness met where "discovery was largely completed as to all issues and parties," settlement discussions "were hard fought and always adversarial," and those negotiations "were conducted by able counsel" with substantial experience).

*iii. Class Counsel is experienced in litigating consumer class-actions.* "The final *Jiffy Lube* 'fairness' factor looks to the experience of class counsel in this particular field of law." *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d at 841 (quoting *In re Mills*, 265 F.R.D. at 255). Class Counsel's experience and track record of success litigating complex class actions against tribal payday lenders is second to none and includes the nation's largest settlements to date involving tribal lending. *Gibbs v. Plain Green*, *LLC*, Case No. 3:17-cv-495 (E.D. Va.), Dec. 13, 2019 Order at Dkt. 141 (granting final approval of the class settlement) and *In re Think Finance, LLC*, Case No. 17-33964 (N.D. Tx.), December 6, 2019 Order at Dkt. 1673 (paying consumers more than $53 million dollars with an additional $380 million in debt forgiveness); *see also Hayes v. Delbert Servs. Corp.*, 3:14-cv-00258-JAG, Dkt. No. 193 at 9-12 (Jan. 20, 2017) (approving a $15 million Virginia class-action settlement arising from a rent-a-tribe lending scheme). Indeed, this Court and many others have found the attorneys here are extremely qualified to represent a consumer class.[10] And, Class Counsel has been found qualified in comparable tribal-lending litigation. *Galloway*, 2020 WL 7482191, at *8 (E.D. Va. Dec. 18, 2020) ("Class Counsel and their firms have extensive

---

[10] *Clark v. Trans Union, LLC*, No. 3:15CV391, 2017 WL 814252, at *13 (E.D. Va. Mar. 1, 2017) ("This Court has repeatedly found that Clark's counsel is qualified to conduct such litigation. … This Court echoes the sentiments previously stated about Clark's counsel because they pertain here with equal vigor."); *Manuel v. Wells Fargo Bank, Nat'l Ass'n*, No. 3:14cv238, 2016 WL 1070819, at *3 (E.D. Va. Mar. 15, 2016) (stating that "this Court would have difficulty overstating Class Counsel's experience[.]"); *Souter v. Equifax Info. Servs., LLC*, No. 3:10CV107, 2011 WL 1226025 (E.D. Va. Mar. 30, 2011) ("[T]he Court finds that Soutter's counsel is qualified, experienced, and able to conduct this litigation. Counsel is experienced in class action work, as well as consumer protection issues, and has been approved by this Court and others as class counsel in numerous cases."); *Heath v. Trans Union*, No. 3:18-cv-720 (E.D. Va. Aug. 6, 2019) (Kelly Guzzo's "reputation in this district, and I am sure in others, are sterling.").

backgrounds in complex and class action litigation and consumer protection litigation.  And, in particular, members of Class Counsel have significant experience in litigating class action lawsuits against tribal lenders."); *Hayes v. Delbert Servs. Corp.*, 3:14-cv-00258-JAG, Dkt. No. 193 at 9-12; Transcript of Hearing at 13, *Turner v. Zestfinance, Inc.*, 3:19-cv-293 (E.D. Va.) "[W]e have Ms. Kelly and Mr. Bennett here, who are well known to me as being experts in this field, but it looks like the other class counsel is like the all-star team of consumer litigation."); Transcript of Proceedings at 40, *In re Think Finance*, No. 17-33964 (Bankr. N.D. Tex.) (the court "had two or three sets of law students that sat through this, and each time I told them that when you come into this hearing you'll see some of the best lawyers in America, and I still feel like that today.").

Class Counsel endorse the Settlement as fair and adequate. Ex. 2, Kelly Decl. at ¶ 32; Ex. 3, Bennett Decl. at ¶ 36. Given Class Counsel's experience in this area, their endorsement should be afforded substantial consideration in a settlement's fairness. *See Jiffy Lube*, 927 F.2d at 159; *see also Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501–02 (E.D. Va. 1995) (concluding requirement met where "plaintiffs' counsel, with their wealth of experience and knowledge in the securities class action area, engaged in sufficiently extended and detailed settlement negotiations to secure a favorable settlement for the Class").

### 4. Under *Jiffy Lube*, the Settlement is Adequate.

"The second *Jiffy Lube* factor, adequacy, requires the court to 'weigh the likelihood of the plaintiffs' recovery on the merits against the amount offered in the settlement.'" *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d at 841 (quoting *In re: NeuStar, Inc.*, 2015 WL 5674798, at *11). In assessing adequate, the Court can consider: (1) the relative strength of the plaintiff's case on the merits; (2) any difficulties of proof or strong defenses the plaintiff would likely encounter if the case were to go to trial; (3) the expected duration and expense of additional litigation; (4) the solvency of the defendant and the probability of recovery on a litigated judgment; (5) the degree

17

of opposition to the proposed settlement; (6) the posture of the case at the time settlement was proposed; (7) the extent of discovery that had been conducted; (8) the circumstances surrounding the settlement negotiations; and (9) the experience of counsel in the substantive area and class action litigation. *See Jiffy Lube*, 927 F.2d at 159.

While Plaintiffs presented strong claims, there were also substantial risks to recovering money from Defendants. For example, Defendants had several plausible merits defenses because the Sequoia Defendants and TCV Defendants never had a direct interaction with Plaintiffs or any class members. The Defendants' corporate structures also posed difficulties with liability and collections. And while Plaintiffs believe that they could overcome these obstacles, certification was by no means a given. A loss on certification would mean that Class Members would receive nothing. Further, the Defendants would have appealed any adverse decision, substantially increasing the duration and expense of the case. Even more importantly, the long delay threatened by continued litigation, continued appeals, and terminal appeal would have allowed National Credit Adjusters to continue collecting $383,000,000.00 in debt from class members and would have significantly increased the difficulty of finding and returning cash payments to this specific consumer class. The settlement eliminates all of these risks and substantially reduces the burden on all parties. Ex. 2, Kelly Decl. at ¶ 33.

Also, despite the successful delivery of over one million class notices, not a single Class Member has substantively objected to the Settlement,[11] and only ten have validly requested exclusion from the class. "Such a lack of opposition … strongly supports a finding of adequacy,

---

[11] Other than the Berman Tobacco and Gravel & Shea fee request. It also deserves noting that even with the Vermont counsel team appearing at this late hour, apparently disgruntled or upset with the case outcome, they could not and did not suggest any complaint, defect, or substantive objection with the settlement. *See generally* ECF No. 50.

for '[t]he attitude of the members of the Class, as expressed directly or by failure to object, after notice to the settlement is a proper consideration for the trial court.'" *In re Microstrategy*, 148 F. Supp. 2d at 668 (quoting *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975)).

As the Court has previously explained, "[b]ecause 'the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.' The lack here of any objections to the settlement and the small number of class members choosing to opt-out of the class strongly compel a finding of adequacy." *Id.* (citing *Sala v. Nat'l R.R. Passenger Corp.*, 721 F. Supp. 80, 83 (E.D. Pa. 1989)). Courts recognize that where the class supports a settlement, it should be approved.[12] Indeed, even a small majority of support creates a presumption in favor of approval. *See Reed v. Gen'l Motors Corp.*, 703 F.2d 170, 174 (5th Cir. 1983) (approving class action settlement where more than 40 percent of class objected or opted out); *Cotton v. Hinton*, 559 F.2d 1326, 1333 (5th Cir. 1977) (nearly 50 percent opted out or objected; settlement nevertheless approved).

If the Court approves the Settlement, then the Class Members will receive monetary relief and debt cancellation. Many Class Members will also automatically receive monetary payments, and those that made payments to NCA in excess of their state usury rates can work with Class Counsel—free of charge—to obtain refunds of usurious interest. And, Class Members believing

---

[12] *See, e.g.*, *In re Beef Industry Antitrust Litig.*, 607 F.2d 167, 180 (5th Cir. 1979); *Laskey v. Int'l Union*, 638 F.2d 954 (6th Cir. 1981) (finding small number of objectors demonstrates fairness of a settlement); *Shlensky v. Dorsey*, 574 F.2d 131 (3rd Cir. 1978) (same); *Bryan v. Pittsburgh Plate Glass Co. (PPG Indus., Inc.)*, 494 F.2d 799, 803 (3d Cir.) (approving settlement where 20 percent opted out or objected); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20 (2d Cir. 1987) (approving settlement with thirty-six objecting); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (granting approval where sixteen percent objected).

their cases are even more valuable or who have higher actual damage claims had the opportunity to opt-out and pursue individual litigation.

While class members' opinion is the most important, the Court should also note the strong support afforded the Settlement by the Attorney General for the Commonwealth of Pennsylvania, the Honorable Russell F. Nelms (Ret.), a retired United States Bankruptcy Judge who is overseeing the Think Finance Litigation Trust as its Trustee, and the Trust's counsel, Gary H. Leibowitz.  Mr. Ackelsberg, in his "capacity as Special Counsel for the Office of the Pennsylvania Attorney General" describes the Settlement:

> The $50 million settlement with TCV and Sequoia reflects the most significant achievement to date in the post-confirmation work of the Litigation Trust. From the perspective of the Commonwealth, this settlement is an outstanding achievement that will directly benefit the consumers of Pennsylvania.

Ex. 6, Ackelsberg Decl. ¶19. Mr. Leibowitz was similarly effusive:

> The "TCV / Sequoia Settlement" that Mr. Guzzo ultimately negotiated is extraordinarily beneficial to the consumer borrower beneficiaries of the Trust.  Both TCV and Sequoia were represented by law firms routinely regarded as some of the best in the country, and TCV and Sequoia had the wherewithal to handle protracted litigation.   The settlement included the resolution of the Trust's significant fraudulent transfer claims.  Given the inherent costs and delays of litigation, and the fact that TCV and Sequoia are funds that do not remain in existence forever, the Trustee and I believe the settlement was exceptional for the Trust.

Ex. 7, Leibowitz Decl. ¶ 34].   And Judge Nelms offered, "I was informed of the settlement negotiations with TCV and Sequoia by my counsel.  Given the substantial amount of the TCV / Sequoia Settlement which I find extraordinary, and the costs and delay of litigation, I wholeheartedly support the settlement."   Ex. 5, Nelms Decl. ¶ 9.

The Settlement is fair, reasonable, and adequate under each of the *Jiffy Lube* factors, and the Court should approve it.

**5.   The Settlement is also fair, reasonable, and adequate under Rule 23(e)(2).**

Under recent amendments to Rule 23, courts consider four additional factors, which almost completely overlap the *Jiffy Lube* factors. *In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Practices and Prods. Liab. Litig.*, 952 F.3d 471, 484 n.8 (4th Cir. 2020). The Rule 23(e)(2) factors have been largely addressed above. The Class Representatives and their counsel have adequately represented the Settlement Class, as the Court recognized in its Preliminary Approval Order. ECF No. 43 ¶ 4. The Settlement was negotiated at arms' length. The Settlement relief is adequate, especially considering the significant risks and potentially lengthy delay of continued litigation. Class members are treated equitably under the Settlement because the tiered formula for payments to Class Members is directly tied to the law of their home states. Class Counsel's fee request is reasonable, and there is no other agreement required to be identified under Rule 23(e)(3).

**B.     The Court should award the Class Representative service awards, attorneys' fees, and costs.**

   **1.  <u>The Court should award the well-earned Service Awards to Plaintiffs</u>.**

George Hengle, Tamara Price, Sherry Blackburn, Alicia Patterson, Sharon Burney, Regina Nolte, Ronald Ivey, Jessica Lewis, Lorene Nelson, Timothy Underwood, and Sharon Gorie request—and Defendants do not oppose—a modest award of $7,500 each for their participation and service to the Class.[13] They took an active role in the litigation. Ex. 2, Kelly Decl. at ¶¶ 40-42. They also understand their roles as class representatives and responsive to Class Counsel throughout the litigation. *Id.* They have reviewed and approved the settlement. Service awards in

---

[13] Darlene Gibbs, Stephanie Edwards, Lula Williams, Patrick Inscho, Lawrence Mwethuku, Kimetra Brice, Earl Browne, and Jill Novorot are not seeking a service award, They will receive a service award out of the pending *Rees* settlement.

this range are reasonable, both here[14] and in other judicial districts.[15] In fact, the requested service awards are well below the national average—an empirical study published in 2006 suggests that the average award per class representative is about $16,000. 4 *Newberg on Class Actions* § 11:38 (4th ed.). Because there were not no objections to the Service Awards and the Plaintiffs earned them through their participation in the case, the Court should approve them.

## 2. <u>The requested attorneys' fees and costs are appropriate and should be awarded.</u>

Under the Settlement Agreement, Class Counsel can seek an award for attorneys' fees and costs of 33.33% of the Settlement Fund. In this case, a one-third fee amounts to $16,681,665. Nevertheless, Class Counsel requests only $11,677,165.50, which is approximately 23.33% of the Settlement Fund. As stated in footnote 1 of the Settlement, Class Counsel negotiated with the Litigation Trust to agree to cap its fee for litigation against the same Defendants in order to maximize recovery to the Class Members.[16] Although the combined total of Class Counsel's

---

[14] *See, e.g.*, *Hayes v. Delbert Servs. Corp.*, 3:14-cv-258 (JAG) (E.D. Va.); *Manuel v. Wells Fargo Nat'l Ass'n*, No. 3:14cv238(DJN), 2016 WL 1070819, at *6 (E.D. Va. Mar. 15, 2016); *Beverly v. Wal-Mart Stores, Inc.*, No. 3:07cv469; *Williams v. Lexis Nexis Risk Mgmt.*, No. 3:06cv241; *Cappetta v. GC Servs. LP*, No. 3:08cv288-JRS (E.D. Va.); *Makson v. Portfolio Recovery Assoc., Inc.*, No. 3:07cv982-HEH (E.D. Va. Feb. 9, 2009); *Daily v. NCO*, No. 3:09CV31-JAG; *Conley v. First Tenn.*, No. 1:10CV1247-TSE (E.D. Va.); *Lengrand v. Wellpoint*, No. 3:11CV333-HEH (E.D. Va.); *Henderson v. Verifications Inc.*, No. 3:11CV514-REP (E.D. Va.); *Pitt v. K-Mart Corp.*, No. 3:11CV697 (E.D. Va.); *James v. Experian Info. Sols.*, No. 3:12CV902 (E.D. Va.); *Manuel v. Wittstadt*, No. 3:12CV450 (E.D. Va.); *Shami v. Middle E. Broadcast Network*, No. 1:13CV467-CMH (E.D. Va.); *Goodrow v. Freidman Freidman & MacFadyen*, No. 3:11CV20 (E.D. Va.); *Berry v. LexisNexis Risk & Info. Analytics Grp., Inc.*, No. 3:11CV274 (E.D. Va.); *Marcum v. Dolgencorp, No.* 3:12CV108 (E.D. Va.); *Kelly v. Nationstar*, No. 3:13CV311 (E.D. Va.); *Wyatt v. SunTrust Bank*, No. 3:13CV662 (E.D. Va.).

[15] *See, e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 976–77 (9th Cir. 2003); *In re Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002); *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

[16] The Litigation Trust incurred significant attorney's fees and costs pursuant to the pre-existing Litigation Trust Agreement. Those fees were proper and necessary.  Nevertheless, before Class Counsel agreed to the present Settlement, which pays class members through the Litigation Trust Agreement, Class Counsel negotiation a cap on the fees that the Litigation Trust Agreement could seek from the settlement. Given that the Trust must also release all bankruptcy-related claims as

requested fees and the Litigation Trust's fee obtained for its role in the shareholder derivative suits in the bankruptcy represents one-third of the Settlement Fund, it is a much smaller percentage of the Settlement's total value after inclusion of the $383,000,000 debt forgiveness.

### i. A percentage fee is appropriate and reasonable here.

Rule 23(h) grants the Court authority to "award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement" in class actions. Fed. R. Civ. P. 23(h). Where the case results in a common fund for the class, the Court may award fees as a percentage of that common fund. The doctrine originates from the equitable principles of quantum meruit and unjust enrichment and aims to shift the expense of litigation from named plaintiffs, who obtained the fund's benefits, to the absent class members, who  benefit from the fund but likely contributed little, or nothing, to the process. *Brundle ex rel. Constellis Employee Stock Ownership Plan v. Wilmington Tr., N.A.*, 919 F.3d 763, 785 (4th Cir. 2019), as amended (Mar. 22, 2019). As the Fourth Circuit has explained, awarding fees as a percentage of the common fund "hold[s] the beneficiaries of a judgment or settlement responsible for compensating the counsel who obtained the judgment or settlement for them." *Id.* at 786.[17]

Courts' preference for the percentage method is common sense. It is easily administered and saves valuable court and party resources, which heeds the Supreme Court's mandate that "request for attorney's fees . . .not result in a second major litigation." *Hensley v. Eckerhart*, 461

---

part of this settlement, this global compromise was the best outcome for the Class, ensuring that they would not pay more fees than they would in a more conventional settlement structure,

[17] Most Circuits either permit or require the percentage method. 5 Newberg on Class Actions § 15:66 (5th ed. Dec. 2020 Update). For example, the Eleventh Circuit and the District of Columbia require the use of the percentage method. *Id.* at n.6 (citing cases). The Third Circuit prefers the percentage method. *Id.* at n.7. And the First, Second, Fifth, Sixth, Eight, Ninth, and Tenth allows district courts to use either method. *Id.* at n.5 (citing cases).

U.S. 424, 437 (1983). The percentage method also aligns the interests of class counsel and the class members because it both motivates class counsel to generate the largest possible recovery for the class and rewards efficient litigation. This is because their fee increases with the class's take, removing any incentive to run up their hours in order obtain a higher fee. A percentage fee also encourages early settlements because class counsel will not receive additional fee for unnecessary motions or discovery. *Johnson v. Metro-Goldwyn-Mayer Studios, Inc.*, 2018 WL 5013764, at *11 (W.D. Wash. 2018) (noting that "the percentage-of-recovery method plays an important role in aligning the interests of the class and class counsel" and "[i]n such situations, class counsel is motivated to obtain the largest tangible benefit possible, to provide for the best possible notice to the class, and to assure that the claims process is not overly burdensome"); *In re Anthem, Inc. Data Breach Litigation*, 2018 WL 3960068, at *5 (N.D. Cal. 2018) ("By tying the award to the recovery of the Class, Class Counsel's interests are aligned with the Class, and Class Counsel are incentivized to achieve the best possible result."); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014) ("The percentage method better aligns the incentives of plaintiffs' counsel with those of the class members because it bases the attorneys' fees on the results they achieve for their clients, rather than on the number of motions they file, documents they review, or hours they work."); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1268–69 (D.C. Cir. 1993) (noting that "using the lodestar approach in common fund cases encourages significant elements of inefficiency," whereas "if a percentage-of-the-fund calculation controls, inefficiently expended hours only serve to reduce the per hour compensation of the attorney expending them").

Conversely, the lodestar method is time consuming and requires lawyers to submit voluminous records that courts must then review and scrutinize in detail. Furthermore, a lodestar

fee incentivizes class counsel to increase the number of hours they spend on a case in order to maximize their fees, regardless of whether that time actually advances the case or class members' interests. *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 821 (3d Cir. 1995) ("[T]he lodestar method has been criticized as giving class counsel the incentive to delay settlement in order to run up fees while still failing to align the interests of the class"). Indeed, the lodestar method is used in only a small percentage of class-action cases, usually those involving fee-shifting statutes or where the settlement provides injunctive relief that cannot be reliably calculated. *See, e.g.*, Theodore Eisenberg et al., *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. Law Review 937, 945 (2017) (finding the lodestar method used only 6.29% of the time from 2009-2013, down from 13.6% from 1993-2002 and 9.6% from 2003-2008); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811, 832 (2010) (finding the lodestar method used in only 12% of settlements).

While the Fourth Circuit has not explicitly required its use in class actions, the percentage method is overwhelmingly preferred by the district courts in this circuit. *Galloway v. Williams*, No. 3:19-CV-470, 2020 WL 7482191, at *5 (E.D. Va. Dec. 18, 2020) (Noting in a comparable tribal-lending case, "Nevertheless, over time, certain customs have developed, both in the Fourth Circuit and across the country; for example, the favored method for calculating attorneys' fees in common fund cases is the percentage of the fund method."); *Thomas v. FTS USA, LLC*, No. 3:13-cv-825 (REP), 2017 WL 1148283, at *3 (E.D. Va. Jan. 9, 2017), *report and recommendation adopted,* No. 3:13-cv-825, 2017 WL 1147460 (E.D. Va. Mar. 27, 2017) ("District Courts within this Circuit have also favored the percentage of the fund method."(citations omitted)); *see also Kelly v. Johns Hopkins Univ.*, No. 1:16-CV-2835-GLR, 2020 WL 434473, at *2 (D. Md. Jan. 28,

2020); *Seaman v. Duke Univ.*, No. 1:15-CV-462, 2019 WL 4674758, at *2 (M.D.N.C. Sept. 25, 2019); *Cox v. Branch Banking & Tr. Co.*, No. 5:16-CV-10501, 2019 WL 164814, at *5 (S.D.W. Va. Jan. 10, 2019) (collecting cases and stating "In sum, there is a clear consensus among the federal and state courts, consistent with Supreme Court precedent, that the award of attorneys' fees in common fund cases should be based on a percentage of the recovery. This consensus derives from the recognition that the percentage of fund approach is the better-reasoned and more equitable method of determining attorneys' fees in such cases."); *Krakauer v. Dish Network, L.L.C.*, No. 14-333, 2018 WL 6305785, at *2 (M.D.N.C. Dec. 3, 2018); *Phillips v. Triad Guar. Inc.*, No. 1:09CV71, 2016 WL 2636289, at *2 (M.D.N.C. May 9, 2016); *Archbold v. Wells Fargo Bank, N.A.*, No. 13-24599, 2015 WL 4276295, at *5 (S.D.W. Va. July 14, 2015) ("[T]he Court concludes that there is a clear consensus . . . that the award of attorneys' fees in common fund cases should be based on a percentage of the recovery.").

      The Fourth Circuit has not established a benchmark for fee awards in common-fund cases. Here, Class Counsel is requesting a 23.33-percent fee. In addition, the Litigation Trust would later be permitted to have incurred and receive a fee (through a separate agreement), making the total fee as much as 33 percent of the Settlement Fund. This is well within the 25-to-40-percent range that courts within the Fourth Circuit have held appropriate.[18] It is also within the appropriate range

---

[18] Indeed, "empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in the class actions average around one-third of the recovery." 4 Newberg *on Class Actions* § 14:6 (4th ed.); *see also In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (review of 289 class action settlements demonstrates "average attorney's fees percentage [of] 31.31%" with a median value that "turns out to be one-third."). In an analysis of such historic patterns, Silber and Goodrich explained that empirical evidence does not necessarily establish what a court should do in any given case, but it does provide guidance to the court in determining whether a fee is reasonable. Reagan W. Silber & Frank E. Goodrick, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 Rev. Litig. 525, 545–46 (1998).

found by the recent comprehensive study of attorneys' fees in class action cases. Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Studies 27, 31, 33 (2004) (noting "a remarkable uniformity in awards between roughly 30% to 33% of the settlement amount."). Notably, in the prior *Gibbs* settlement, this Court approved a 33-percent fee award. *Gibbs II* at ECF 141, ¶ 24. In addition, Judge Payne recently awarded a 33-percent fee award in a similar internet-lending class settlement, holding, "A percentage award of 33% of a common fund is a bit on the high side for this circuit and in general, but it is certainly not outside of the realm of reasonable percentage awards, particularly given that the award will be inclusive of costs." *Galloway v. Williams*, No. 3:19-cv-470, 2020 WL 7482191, at *11 (E.D. Va. Dec. 18, 2020) (citing *In re Celebrex (Celecoxib) Antitrust Litig.*, No. 2:14-cv-361, 2018 WL 2382091, at *5 (E.D. Va. Apr. 18, 2018). In consumer class actions generally, and tribal-lending cases specifically, there is a tremendous amount of necessary post-approval. This case is no exception. After Final Approval, Class Counsel will implement the settlement through the Think Finance Litigation trust distributions and assist class members with NCA debt-recovery claims. The NCA claims process will require Class Counsel to calculate and demand the amount of usurious interest to be repaid to each submitted claim. As Judge Novak recently held in a similar case: "I am going to approve that. It represents 33 percent of the monetary value. The lodestar multiplier is 3.86, but believing that number is going to fall for the reasons you just said about the continuing work." *Turner v. ZestFinance, Inc*., Case. No. 3:19-cv-293, ECF 116 at 16:1-5 (E.D.Va. Aug. 4, 2020).

As with any class case that they agree to take on, Plaintiffs' Counsel live by the result that they obtain for the Class Members. Even though the fee in this case is large, Class Counsel has

consistently advocated for fees based on the percentage method, even in circumstances where it results in a small fee well below their lodestar. *Milbourne v. JRK Residential America, LLC*, No. 3:12-cv-861 (ED. Va.); *Mayfield v. Memberstrust Credit Union*, 3:07-cv-506 (E.D. Va.) (fee of $8,300); *Thomas v. FTS USA, LLC*, No. 3:13-cv-825 (REP), 2017 WL 1148283, at *3 (E.D. Va. Jan. 9, 2017), *report and recommendation adopted,* No. 3:13CV825, 2017 WL 1147460 (E.D. Va. Mar. 27, 2017); *Conley v. First Tennessee*, 1:10-cv-1247 (E.D. Va.) (300 consumers and fee of $20,000); *Lengrand v. Wellpoint*, No. 3:11-cv-333-HEH (E.D. Va.) (Doc. 42) (counsel requested only 20% of the class recovery, $8,550, due to the small class size). In each case, the standards of Rule 23 demand that Class Counsel represent the interest of the class with the same attention, zeal, and competence whether the class is in the millions or not. In this case, where Class Counsel bore the risk of the litigation entirely and advanced significant funds in furtherance of the litigation, the requested fee is reasonable.

> ***ii. A cross-check against Counsel's lodestar confirms the requested fee is reasonable.*** A cross-check is not required to determine the fairness of a fee when the percentage method is used. However, courts have, on occasion, used a lodestar estimate as a cross-check in assessing Class Counsel's fee request. *Manual for Complex Litigation (Fourth)* § 21.724. As this Court has recently recognized, "where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Galloway v. Williams*, No. 3:19-CV-470, 2020 WL 7482191, at *11 (E.D. Va. Dec. 18, 2020).

Here, the requested award includes both attorneys' fees and costs. For fees, Class Counsel estimates that its combined lodestar exceeds $2,524,101.30. Ex. 2, Kelly Decl. at ¶¶ 29-30; Ex. 3,

Bennett Decl. at ¶ 37; Ex. 4, Haac Decl. at ¶ 29; Ex. 8, Wessler Decl. at ¶ 14.[19] Class Counsel has also incurred $29,877.07 in unreimbursed expenses, including filing fees, process server fees, expert witness fees for Dr. Wheatman for the class notice, federal express charges, corporate records research, and copying fees. Ex. 2, Kelly Decl. at ¶¶ 29-30; Ex. 5, Haac Decl. at ¶ 50. While Class Counsel were able to use their knowledge and document productions from prior Think Finance litigation to more effectively litigate the Plaintiffs' claims in this case, their lodestar and costs do not include any of the fees or costs sought in the United States Bankruptcy Court for the Northern District of Texas or in any of the prior class-action settlements, and Plaintiffs here have done their best to separate and allocate time among all of the cases.  In addition, Class Counsel's fee request includes an additional, estimated loadstar for their post-approval work in the case. Of course, this time is just a conservative estimate, and Class Counsel is obligated to complete all post-approval work, regardless of the actual time incurred.  In past comparable cases, Class Counsel's actual post-approval work exceeded their request in this case by at least ten percent.

The requested $2,524,101.30 fee represents a 4.63 multiplier for Class Counsel.[20] In light of the Settlement's benefits, this multiplier is reasonable. *Berry v. Schulman,* 807 F.3d 600, 617 n. 9 (4th Cir. 2015) (noting that using the lodestar method, "the district court multiplies the number of hours worked by a reasonable hourly rate. And it can then "adjust the lodestar figure using a 'multiplier' derived from a number of factors, such as the benefit achieved for the class and the complexity of the case.") This multiplier is well-within the range approved in other settlements

---

[19] Counsel's hourly rates are reasonable. Ex. 2, Kelly Decl. at ¶¶ 18-26; Ex. 4, Bennett Decl. at ¶ 40; Ex. 5, Haac Decl. at ¶¶ 23-28; Ex. 9, Pittman Decl.

[20] In total, assuming the maximum fee available to the Litigation trust counsel for work performed there reaches the 1/3 of 1/3 agreed cap, the multiplier on the total fee paid by the Class would be 6.61.

both in the Fourth Circuit and nationally.[21] Particularly in light of the result achieved, the requested fee is reasonable and appropriate. Ex. 9, Pittman Decl. Notably, the Class was made aware of the proposed fee, and no one objected to it.[22]

## CONCLUSION

The Settlement is an excellent resolution of the claims against Sequoia, TCV, and National Credit Adjustors because it was reached at arms' length and eliminates the substantial cost and burden of litigating the claims to their conclusion. It satisfies the strictures for final approval, and the Court should approve it.

Respectfully submitted,
**PLAINTIFFS**

By:____*/s/ Kristi C. Kelly*____
Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

---

[21] *See, e.g., Skochin v. Genworth Financial, Inc.,* No. 3:19-cv-49, 2020 WL 6708388 (E.D. Va. Nov. 13, 2020) (finding 9.05 multiplier not unreasonable in lodestar cross-check analysis); *Spartanburg Regional Health Services District Inc. v. Hillenbrand Industries, Inc.,* No. 7:03-2141-HFF, 2006 WL 8446464 (D.S.C. Aug. 15, 2016) (approving fee award which resulted in multiplier above 6); *see also Lloyd v. Navy Federal Credit Union,* Case No. 3:17-cv-01280-BAS-RBB (S.D. Cal. 2019) (approving fee which resulted in multiplier of 10.96); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.,* No. 03-cv- 04578, 2005 WL 1213926 (E.D. Pa. May 19, 2005) (15.6 multiplier); *New Eng. Carpenters Health Benefits Fund v. First Databank,* No. 05-cv-11148, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (8.3 multiplier); *In re Doral Financial Corp. Securities Litigation,* No. 05-cv-04014-RO (S.D.N.Y. Jul. 17, 2007) (10.26 multiplier); *Beckman v. KeyBank,* N.A., 293 F.R.D. 467, 481 (S.D.N.Y. 2013) ("Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers.").

[22] Even Berman Tobacco and Gravel & Shea does not object to the requested fee, only how it is allocated among attorneys.

Email: casey@kellyguzzo.com

Leonard A. Bennett, VSB #37523
Craig C. Marchiando, VSB #89736
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com
Email: craig@clalegal.com

Anna C. Haac (*pro hac vice*)
Tycko & Zavareei LLP
1828 L Street, NW, Suite 1000
Washington, DC. 20036
(202) 973-0900
(202) 973-0950 Facsimile
Email: ahaac@tzlegal.com

*Counsel for Plaintiffs*